# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

JASON SCHAUMLEFFEL,

        **Plaintiff,**

                                       **Case No.: 2:17-cv-463**

**-v-**                                    **JUDGE GEORGE C. SMITH**

                                       **Magistrate Judge Jolson**

MUSKINGUM UNIVERSITY, *et al.*,

        **Defendants.**

## OPINION AND ORDER

Plaintiff Jason Schaumleffel initiated this case against Defendants Muskingum University ("Muskingum"), Macey Zambori, Mackenzie Dickerson, Mark Neal, and John Does 1–5. Plaintiff alleges that he has been harmed by false allegations of sexual misconduct and has brought the following claims against the Defendants: violations of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq*., breach of contract, promissory estoppel, negligence, fraud, negligent misrepresentation, breach of the covenant of good faith and fair dealing, defamation, false light invasion of privacy, publication of private facts, and negligent and intentional infliction of emotional distress. (Doc. 1, Compl.). Plaintiff seeks a declaratory judgment, money damages, and injunctive relief. This matter is currently before the Court on Defendants Muskingum, Zambori, and Dickerson's Motions to Dismiss Plaintiff's Complaint (Docs. 5, 29, and 33). The matter is now ripe for review. For the reasons that follow, Defendants' Motions to Dismiss are **GRANTED IN PART AND DENIED IN PART.**

# I. BACKGROUND

## A. The Parties

Plaintiff Jason Schaumleffel in an Ohio resident and was a student at Muskingum University prior to his expulsion. (Doc. 1, Compl. ¶ 18). Plaintiff also served a member of the Board of Education of Tri-Valley Local Schools during the timeframe at issue in this case. (Id. at ¶ 5). Defendant Muskingum is located in New Concord, Ohio. Defendants Macey Zambori and Mackenzie Dickerson are students at Muskingum. (*Id*. at ¶¶ 19–21). Does 1–5 are individual Muskingum students and/or employees who disclosed the nature of the allegedly false statements made by Defendants Zambori and Dickerson and Muskingum's findings and discipline in response to those charges to Mark Neal, the Superintendent of Tri-Valley Local Schools, and/or other third parties. (*Id*. at ¶ 22).

## B. Muskingum's Student Handbook

Muskingum's 2016–17 Student Handbook outlines the process by which a complaint alleging sexual assault is handled. (Doc. 1, Compl. ¶ 150; Student Handbook attached as Ex. 17). Once a complaint is filed, Muskingum conducts a preliminary investigation. (Doc. 1–17, Handbook at 64). Valerie Smith, Muskingum's Director of International Student Services and Special Programs, and Beth Fox, Muskingum's head women's basketball coach and Senior Women's Administrator, were charged with conducting the investigation at issue in this case. (*Id*.). The Handbook states that "Cases involving physical contact or severe harassment will likely be resolved through the Community Standards Board hearing process." (*Id*.). The Community Standards Board is made up of students, staff, and faculty members, and functions as "the upper level disciplinary body of the University for resolving allegations of major violations of the Code of Student Conduct." (*Id*. at 50).

## C.     The Alleged Misconduct

### 1.     Miss Mackenzie Dickerson

Plaintiff and Defendant Dickerson were both enrolled as students at Muskingum during the events at issue in this case.  In November 2016, Plaintiff met Miss Dickerson through an app called Tinder.  (Doc. 1, Compl. ¶ 26).  The two exchanged numerous text messages via Tinder that illustrate that they were getting to know one another and planning to become romantically involved.  (*Id*. at ¶ 27 (setting forth the text messages in their entirety)).  They also exchanged phone numbers and exchanged text messages.  They were unable to meet up during the next few weeks but continued to exchange numerous sexually explicit text messages, including each of them sending nude photographs of themselves to the other.  (*Id*. at ¶¶ 28–30).  Some examples of the text messages include, when asked how kinky or adventurous she was, Miss Dickerson responded "I'm pretty adventurous" and "I like it very rough."  She continued, "I like it when I'm being thrown around, my hair being pulled, and my ass being slapped."  Additionally, she texted:  "I bet the next eleven days are going to drive you crazy thinking about how you want to control me, how it would feel to have my lips on your cock, wondering what I taste like, wanting to be able to touch me however you want to."  (*Id*. at ¶ 30).  Plaintiff was shocked and responded to a couple of the messages with "Holy f__k Mackenzie."  (*Id*.).  He was very excited and continued to engage in the sexual text messages.

When the students returned from Thanksgiving break, Plaintiff and Miss Dickerson finally spent some time together.  The first night they hung with friends and kissed.  (*Id*. at ¶¶ 31–32).  The next day, Miss Dickerson invited Plaintiff to her room.  They began kissing and engaged in some dry humping, but Plaintiff had to leave when Miss Dickerson's roommate returned home.  (*Id*. at ¶¶ 33–41).  They had planned to spend the night together on Friday of that

week because Plaintiff's roommate was out of town, but something came up and Miss Dickerson was unavailable. They went to lunch at Bob Evans on Saturday afternoon. (*Id.* at ¶¶ 42–43). On their way back to campus, they agreed to go to the New Concord Reservoir where they engaged in foreplay and then discussed having sex. Miss Dickerson said she wanted to and the couple had intercourse. (*Id.* at ¶¶ 47–78). Plaintiff drove Miss Dickerson back to her dorm and that is the last time he saw her in person. (*Id.* at ¶ 79). Plaintiff alleges that Miss Dickerson did not initially want to file a sexual misconduct charge against him, but Muskingum's Title IX Officer Farley convinced Miss Dickerson to do so by telling her that Plaintiff had previously engaged in sexual misconduct with Miss Zambori. (*Id.* at ¶ 154).

### 2. Miss Macey Zambori

Plaintiff met Defendant Zambori, who was also a student at Muskingum, during Student Senate and in a Health and Fitness class. (*Id.* at ¶ 84). In February 2016, they exchanged messages via Facebook messenger and eventually exchanged phone numbers. (*Id.* at ¶ 85). The two hung out a couple days and they kissed and engaged in some sexual activities but did not have intercourse. They discussed sex and Miss Zambori said she wanted to wait until marriage. They continued to engage in other sexual related acts. The next day, Plaintiff and Miss Zambori saw each other in class and talked a little. Then, the following day, Plaintiff received a No Contact Directive prohibiting Plaintiff from contacting Miss Zambori.[1] (*Id.* at ¶¶ 85–99).

Miss Zambori did not file a complaint for sexual misconduct against Plaintiff until January 2017, almost a year after requesting the No Contact Directive, and only after Muskingum requested her to do so after Miss Dickerson filed her complaint. (*Id.* at ¶ 155). On January 20, 2017, Miss Zambori told Plaintiff's fraternity brother, Matt Triola, that

---

[1] The basis for the No Contact Directive, including a copy of the directive and any notes, are not part of the record in this case.

Muskingum's student life office requested that she file a sexual misconduct charge against Plaintiff, stating that "It had happened to another girl" and that they needed her to write a statement about what had happened between her and Mr. Schaumleffel in February 2016, leading to the No Contact Directive. (*Id.* at ¶¶ 156–157).

**D.    Muskingum's Investigation and Discipline of Plaintiff**

On January 16, 2017, Muskingum's Title IX Coordinator/Director of Student Conduct Amber (Zifzal) Farley ("Farley") sent Plaintiff a "Notice of Investigation" letter which identified Farley as "Title IX Coordinator" and Smith and Fox as "University Title IX Investigators" regarding allegations against him from an unidentified source (and) attached a statement of his rights. (Doc. 1–27, Farley's January 16, 2017 Notice of Investigation letter). Prior to conducting the initial interview of Plaintiff, Smith and Farley communicated with him via email. Smith explained that she would be the lead investigator and Fox would serve as the note taker and that he would have an opportunity to review the typed notes of his interview. (Doc. 1, Compl. ¶ 159; Doc. 1-29). Smith and Fox conducted their initial interview of Plaintiff on January 25, 2017. (*Id.*). On January 31, 2017, Smith emailed Plaintiff the transcript of the investigators' interview with him. (Doc. 1, Compl. ¶ 161; Doc. 1-31, January 31, 2017 email from Smith to Mr. Schaumleffel). On February 1, 2017, Plaintiff emailed Smith with concerns about the interview transcript, stating, "I found numerous occasions where a statement I made was transcribed but the following explanation was missing." (Doc. 1, Compl. ¶ 162). Plaintiff was given one week to respond to the interview transcript. (Doc. 1-32, Feb. 1, 2017 email from Smith to Mr. Schaumleffel). On February 7, 2017, Plaintiff provided documentation to supplement the investigation transcript. He provided additional documentation the next day and also asked for a few weeks to compile relevant text and snapchat messages. (Docs. 1-33 and 1-34, Feb. 7, 2017

and Feb. 8, 2017 emails from Mr. Schaumleffel to Smith).  Plaintiff, however, was not given any additional time and the Investigation Report was submitted to Title IX Coordinator Farley on February 22, 2017.  (Doc. 1-35).

On March 1, 2017, Plaintiff met with Farley to receive a copy of the Investigation Report and at that time, he was informed that two separate complaints had been filed against him.  (Doc. 1, Compl. ¶ 168).  Farley asked Plaintiff to consent to consolidate the two hearings and Plaintiff agreed.  (*Id*. at ¶ 169; Doc. 1–36).  Plaintiff ultimately responded in writing to the Investigation Report, noting the errors and asserting that the text messages he exchanged with Miss Dickerson illustrate her desire and intent to engage in sexual activity.  (Doc. 1–37).  Plaintiff was not informed who the complainants were prior to his interview and wasn't able to present this evidence at the interview, therefore it was not included in the Investigation Report.  It was later added as an addendum to the Investigation Report.  (Doc. 1–37, Pl. Resp. to Report at 4).

On March 14, 2017, Muskingum's Community Standards Board conducted a hearing on the allegations brought by Miss Zambori and Miss Dickerson against Plaintiff.  (Doc. 1, Compl. ¶ 173).  The Community Standards Board was comprised of:  Muskingum administrator Stacey Allan (Chair), and Muskingum faculty members Kenneth Blood, Hallie Baker, and Peter Gosnell.  Despite the Handbook stating that the Community Standards Board should include students, there were no students that heard and decided the charges against Plaintiff.  (*Id*. at ¶¶ 174–178).[2]  During the hearing, Smith prevented Plaintiff from answering questions from Board

---

[2]  According to Muskingum's Student Handbook, for all cases resolved through the Community Standards Board process, the Community Standards Board shall be composed as follows:  "The [Community Standards] board is composed of students, staff and faculty members.  Their responsibilities include determining whether an alleged is responsible or not responsible for violations of the Code of Student Conduct and recommending sanctions to the board chair…."  (Doc. 1–17, Student Handbook at 50).  The Student Handbook further specifies the following quorum requirement for proceedings of the

Member Blood about other sexual activity with Miss Zambori or Miss Dickerson besides the sexual activity that formed the basis for their charges. (*Id*. at ¶ 179). The Board ultimately found Plaintiff responsible for non-consensual sexual intercourse and sexual harassment and expelled him from Muskingum. (Doc. 1–38, Findings of the Community Standards Board).

Plaintiff was advised of his right to appeal the decision of the Community Standards Board within five business days of the decision. (*Id*.). According to Muskingum's Handbook, the appeal panel has the option to refer the case back to the Community Standards Board or to another hearing body "as appropriate" or to adjust the findings or sanctions of the Board. (Doc. 1–17, Handbook at 58).

On March 15, 2017, Plaintiff emailed Farley to ask if they could meet to discuss the findings and sanction of the Community Standards Board. Farley agreed that she and Stacey Allan, Chair of the Board, would meet with him the next day. (Doc. 1–39, March 15, 2017 email exchange). On March 16, 2017, Plaintiff met with Farley and Allan to discuss the Community Standards Board's decisions and his appeal. Plaintiff claims that they discouraged him from appealing the findings of responsibility and advised him to appeal only the harshness of the sanction of expulsion. (Doc. 1, Compl. ¶¶ 186–188).

Plaintiff filed his appeal on March 18, 2017, and he argued that the expulsion sanction was too harsh and requested that Muskingum allow him to complete his final semester from home so that he could graduate after the Fall 2017 semester. (Doc. 1–40). On March 21, 2017, Muskingum denied Plaintiff's appeal, stating, "The Board did not find any compelling information, in your appeal letter, showing a procedural error where sanctions were assigned

---

Community Standards Board: "Five members, with at least three students and two faculty/staff members will constitute a quorum." (*Id*.).

greater than the stated possible outcomes.  Given this, your appeal has been denied.  This decision is now final and cannot be further appealed."  (Doc. 1–41, letter denying appeal).

As detailed in this Complaint, Plaintiff alleges that gender bias motivated Muskingum's actions in this case.  Specifically, Plaintiff states that "widespread anti-male bias exists at Muskingum in part because of an April 11, 2011 "Dear Colleague" letter issued by the United States Department of Education's ("DOE") Office of Civil Rights ("OCR") which instructed how colleges and universities must investigate and resolve complaints of sexual misconduct under Title IX."  (Doc. 1, Compl. ¶ 106).

**E.     Alleged Damages to Plaintiff**

Plaintiff alleges that his rights under the Family Educational Rights and Privacy Act ("FERPA") were violated when Muskingum students and/or employees disclosed the allegations, findings of the Board, and Plaintiff's expulsion to Mr. Neal.  Mr. Neal then requested the records from Muskingum noting specifically Plaintiff's "arrest, expulsion/removal, investigation, or charges for sexual assault."  (Doc. 1–43, letter from Neal to Muskingum's Dean of Students).  Neal was told that the records could not be released without a signed release by Plaintiff.  Plaintiff served as a board member of the Tri-Valley Local School District and Neal used the information he received from Does 1–5 to notify other board members and employees of Tri-Valley Schools.  A newspaper article about Plaintiff entitled "Tri-Valley Board Member Under Investigation" was published in the Zanesville Times Recorder on March 31, 2017.  (Doc. 1–47).  Whiz News also published an article about Plaintiff on April 6, 2017.  (Doc. 1, Compl. ¶ 211).  The Tri-Valley Board of Education issued a press release stating in part:

> Mr. Schaumleffel was recently expelled from Muskingum University and banned from campus property for Title IX violations (sexual misconduct).  At both the April and May school board meetings, members of the community that were in attendance asked several questions of Mr. Schaumleffel.  His response to every

single question for the last two months has been simply, "no comment." These are the facts known to the Tri-Valley Board of Education that resulted in asking Mr. Schaumleffel to resign.

(Doc. 1–49).

Plaintiff alleges that as a result of this incident, he has been suffering from depression, panic attacks, and difficulty sleeping and interacting socially. He also has suffered from mental anguish, personal humiliation, loss of reputation, loss of employment opportunities and/or wages, reduced future earning capacity, among others. (Doc. 1, Compl. ¶¶ 202–203). Plaintiff initiated this case on May 29, 2017, alleging claims for violations of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq*., breach of contract, promissory estoppel, negligence, fraud, negligent misrepresentation, breach of the covenant of good faith and fair dealing, defamation, false light invasion of privacy, publication of private facts, and negligent and intentional infliction of emotional distress. (Doc. 1, Compl.). Plaintiff seeks a declaratory judgment, money damages, and injunctive relief.

## II.    STANDARD OF REVIEW

Defendants bring this motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, alleging that Plaintiff has failed to state a claim upon which relief can be granted.

Under the Federal Rules, any pleading that states a claim for relief must contain a "short and plain statement of the claim" showing that the pleader is entitled to such relief.  Fed. R. Civ. P. 8(a)(2).  To meet this standard, a party must allege sufficient facts to state a claim that is "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A claim will be considered "plausible on its face" when a plaintiff sets forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." A*shcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Rule 12(b)(6) allows parties to challenge the sufficiency of a complaint under the foregoing standards.  In considering whether a complaint fails to state a claim upon which relief can be granted, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."  *Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 835 (6th Cir. 2012) (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)). However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 663.  Thus, while a court is to afford plaintiff every inference, the pleading must still contain facts sufficient to "provide a plausible basis for the claims in the complaint;" a recitation of facts intimating the "mere possibility of misconduct" will not suffice.  *Flex Homes, Inc. v. Ritz-Craft Corp of Mich., Inc.*, 491 F. App'x 628, 632 (6th Cir. 2012); *Iqbal*, 556 U.S. at 679.

## III. DISCUSSION

Plaintiff Jason Schaumleffel alleges violations of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, breach of contract, promissory estoppel, negligence, fraud, negligent misrepresentation, breach of the covenant of good faith and fair dealing, defamation, false light invasion of privacy, publication of private facts, and negligent and intentional infliction of emotional distress. (*See generally* Doc. 1, Compl.). Defendants Zambori and Dickerson have each moved to dismiss Plaintiff's claims of defamation per se, defamation per quod, and intentional and negligent infliction of emotional distress asserted against them in Counts 1, 2, 13, and 14 of the Complaint. Defendant Muskingum College has moved to dismiss all of Plaintiff's claims against them as set forth in detail in Counts 3 through 15.[3] The Court will address the motions to dismiss in turn.

### A. Defendant Macey Zambori's Motion to Dismiss

Defendant Zambori moves to dismiss all of Plaintiff's claims against her arguing that they are all barred by the one-year statute of limitations. Defendant Zambori asserts that under Ohio law, defamation claims and emotional distress claims arising out of the same set of facts as the defamation claim must be filed within one year of the first time the allegedly defamatory statement was made. She argues that she first reported Plaintiff's conduct to Muskingum in February of 2016, when she obtained a "No Contact" order against him.[4] Miss Zambori then

---

[3] Defendants Neal and Does 1–5 have not filed a motion at this time, therefore, Plaintiff's claims against them remain pending.

[4] The Investigation Report specifically references the documentation of the meeting with Student Life in February 2016, as well as Miss Zambori's written account. (Doc. 1–35). However, none of these documents have been made available to the Court to know specifically what statements were made by Miss Zambori in February 2016 that led to the "No Contact" order.

argues that Plaintiff did not file this action until May 29, 2017, more than one year after she made the alleged defamatory statements about Plaintiff.

Plaintiff counters that his claims against Zambori are not based on the report she made in February 2016, but instead the statements she made in January 2017 to Plaintiff's fraternity brother, Matt Triola, "and other friends and acquaintances." (Doc. 1, Compl. ¶ 218). Plaintiff argues that the statement made to Triola pertained to the same general topic of the alleged sexual misconduct by Plaintiff, but it was not the same statement. Plaintiff describes that Zambori's January 2017 statement contained new false information about him allegedly engaging in sexual misconduct with another girl. Additionally, Plaintiff argues that the February 2016 report Miss Zambori made to Muskingum was subject to an absolute privilege, relying on *Savoy v. Univ. of Akron*, 2014-Ohio-3043, 15 N.E.3d 430 (10th Dist.). The *Savoy* court states that "a statement in a judicial or quasi-judicial proceedings is absolutely privileged and may not form the basis for a defamation action as long as the allegedly defamatory statement is reasonably related to the proceedings." *Id*. at 435, citing *Hecht v. Levin*, 66 Ohio St.3d 458, 460, 613 N.E.2d 585 (1993). The *Savoy* court held that absolute privilege applied to testimony provided during university disciplinary hearings. *Id*.

There is no dispute that a one year statute of limitations applies to all defamation claims brought pursuant to Ohio law. *See* Ohio Rev. Code § 2305.11(A) ("An action for libel [or] slander . . . shall be commenced within one year after the cause of action accrued. . ."). '"[T]he statute of limitations begins to run when the allegedly defamatory words are first spoken or published regardless of the aggrieved party's knowledge of them.'" *Friedler v. Equitable Life Assur. Soc. of U.S.*, 86 F. App'x 50, 53 (6th Cir. 2003) (quoting *Sabouri v. Ohio Dep't of Job & Family Servs.*, 145 Ohio App. 3d 651, 654, 763 N.E.2d 1238 (10th Dist. 2001)). "This is known

as the 'first publication' rule."  *Gentile v. City of Solon*, No. 1:12CV1657, 2013 U.S. Dist. LEXIS 3408, at *2. (N.D. Ohio Jan. 9, 2013).

There are two questions the Court must consider in determining whether the first publication rule applies in this case, and ultimately, whether Plaintiff's claims against Miss Zambori are barred by the one-year statute of limitations.  First, do Miss Zambori's statements in February 2016 constitute defamatory statements or are they subject to an absolute privilege and therefore not actionable?  Second, even if the allegations of defamatory comments from January 2017 were similar to the February 2016 statements, were the latter statements a delayed circulation of the original, or a new conversation with new listeners and new content?

With respect to the first claim of privilege, the Court is unaware of any information or records regarding the content of Miss Zambori's statements to Muskingum or what formed the basis for her obtaining the No Contact Directive.  Further, there did not appear to be any notice and opportunity to be heard provided to Plaintiff to constitute some type of quasi-judicial proceeding.  If the defamation claim concerned the proceedings that took place in 2017, those would be quasi-judicial in nature as contemplated in *Savoy*.  Miss Zambori counters that her statement to Muskingum may have been subject to a qualified or conditional privilege but that "does not change the actionable quality of the words published, but merely rebuts the inference of malice that is imputed in the absence of privilege."  (Doc. 37, Def. Zambori's Reply at 5, citing *Hahn v. Kotten*, 331 N.E.2d 713, 718 (Ohio 1975)).  Again the problem is the lack of information available. Plaintiff argues that the comments made in January 2017 are the basis for his defamation claim, not the statements made in February 2016 made for the purpose of obtaining the No Contact Directive. As stated above, these statements have not been provided to the Court.  Accordingly, there is not enough information to resolve the first issue.

Next, Plaintiff relies on *Clark v. Viacom Int'l, Inc.*, 617 Fed. Appx. 495, 504 (6th Cir. 2015), in asserting that the statute of limitations period was reset in this case when Miss Zambori made a false allegation to Plaintiff's fraternity brother and other friends and added the new information that Plaintiff had done it again to another girl.  (Doc. 35, Pl.'s Resp. in Opp. at 6).  In *Clark*, the Sixth Circuit held:

> "notwithstanding the single publication rule, the statute of limitations resets where the speaker republishes the defamatory statement, such as 'in a later edition of a book, magazine or newspaper.'  *Firth*, 775 N.E.2d at 466.  The rule applies as long as the new iteration of the statement 'is not merely a delayed circulation of the original edition.'  *Id.* (internal quotation marks omitted).

> The general rationale behind the rule is that if the speaker affirmatively says the same thing again at a later time to a new audience, then he has intended to engender additional reputational harm to the plaintiff.  *Id.*

*Clark*, 617 Fed. Appx. at 504–05.

Miss Zambori counters that the Sixth Circuit case in not applicable and involved Tennessee law, whereas Ohio law is applicable in this case.  She argues that "Ohio courts have expressly rejected the argument that re-publishing an allegedly defamatory statement restarts the statute of limitations.  *See, e.g.*, *Gentile*, 2013 U.S. Dist. Lexis 3408, at *7-8 ("Ohio courts have consistently refused to apply any proposed continuing defamation rule, instead opting to apply the 'first publication' rule.")."  (Doc. 37, Def. Zambori's Reply at 6).

Again, in analyzing this issue, the Court does not know the specific statements made in February 2016.  Knowledge of those statements is essential to determine whether it was actually repeated in January 2017.  The only alleged defamatory statements occurred in January of 2017.  There are no specific allegations of defamation with respect to whatever statements formed the basis for the No Contact Directive in February 2016.  Therefore, because it is not clear from the pleadings alone that Plaintiff's defamation claim is barred by the statute of limitations, dismissal at this stage in the proceedings is inappropriate.

Zambori argues for the first time in her Reply brief that her alleged statements do not constitute defamation. However, because Plaintiff is raising this argument for the first time in her reply brief and Plaintiff has not had the opportunity to respond, the Court will not consider this argument. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) ("[W]e have found issues to be waived when they are raised for the first time in . . . replies to responses.").

Zambori also argues that Plaintiff's claims for intentional and negligent infliction of emotional distress are time-barred because they arise out of the same facts as the defamation claim and therefore subject to the one-year statute of limitations. Zambori is correct that the emotional distress claims are derivative of the defamation claims and therefore subject to the one-year statute of limitations period. When a plaintiff alleges he suffered emotional distress as a result of false allegations against him, such a claim "is properly characterized as a 'disguised defamation' claim" and is subject to the same statute of limitations as the defamation claim. *See Breno v. City of Mentor*, 8th Dist. Cuyahoga No. 81861, 2003-Ohio-4051, ¶ 12. However, because the Court has found insufficient information to determine whether Plaintiff's defamation claims are time-barred, the Court cannot make that determination with respect to Plaintiff's emotional distress claims.

**B.      Defendant Dickerson's Motion to Dismiss and Motion to Strike**

Defendant Dickerson moves to dismiss Plaintiff's defamation and emotional distress claims brought against her arguing that the allegations are insufficient to maintain those claims.[5] The Court will address those arguments in turn.

---

[5] Plaintiff concedes that Count 14 for negligent infliction of emotional distress should be dismissed due to unique pleading requirements of that claim. (Doc. 36, Pl.'s Resp. at 1).

### 1.      Defamation

Defamation is the publication of a false statement "made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession." *Savoy*, 15 N.E.3d at 435 (quoting *Jackson v. Columbus*, 883 N.E.2d 1060, ¶ 9, 117 Ohio St. 3d 328, 2008-Ohio-1041 (Ohio 2008)).  In Ohio, there are two types of defamation: defamation per se and defamation per quod.  Defamation per se "is defamatory on its face and by the very meaning of the words spoken or written." *Fenley v. Bowman*, 12th Dist. Clermont No. CA98-02-013, 1998 WL 526516, *2 (August 24, 1998).  A statement is defamation per se if it "tends to injure a person in his or her trade, profession, or occupation and both damages and actual malice are presumed to exist." *Knowles v. Ohio State Univ*., 10th Dist. Franklin No. 02AP-527, 2002-Ohio-6962, ¶ 24.  Defamation per quod exists "where words appear harmless but become defamatory by innuendo or extrinsic evidence." *Id*.

The essential elements of a defamation action under Ohio law, whether slander or libel, "are that the defendant made a false statement, that the false statement was defamatory, that the false defamatory statement was published, that the plaintiff was thereby injured, and that the defendant acted with the required degree of fault." *Daubenmire v. Sommers*, 156 Ohio App.3d 322, 2004-Ohio-914, 805 N.E.2d 571, ¶ 80 (12th Dist.) (citing *Celebrezze v. Dayton Newspapers, Inc.*, 41 Ohio App.3d 343, 347, 535 N.E.2d 755 (8th Dist. 1988)).

Miss Dickerson argues that the allegations of defamation against her are "not specific enough to identify the supposed statements, nor does Plaintiff point to an identifiable third party to whom they were made." (Doc. 33, Def. Dickerson's Mot. at 7).  In the alternative, she argues

that "even statements which would otherwise constitute defamation per se are not actionable per se when the defendant has a qualified privilege." (*Id*.).

Plaintiff counters that Miss Dickerson made false statements that Plaintiff engaged in non-consensual sexual contact with her to friends and acquaintances, which was non-privileged defamation. Specifically, Plaintiff alleges that "Ms. Dickerson's Non-Privileged Defamation included her statements to friends that Mr. Schaumleffel had engaged in non-consensual sexual intercourse with her in late November of 2016 to justify her request that they accompany her to the emergency room to have a rape kit taken and to obtain Plan B contraception." (Doc. 1, Compl. ¶ 221). Plaintiff asserts that in addition to alleging the statements were made to friends and acquaintances, in the exhibits, Plaintiff identifies two people specifically, Grace Johnson and Maggie Wallman. (*See* Docs. 1-35 and 1-37). Therefore, Plaintiff has established that at this stage in the proceedings, he has sufficiently alleged a third-party to whom the alleged defamatory statements were made.

Dickerson's second argument in support of her motion to dismiss is that the alleged defamatory statements were privileged and therefore not actionable. A qualified or conditionally privileged statement exists when the statement is:

> "*** made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or duty, if made to a person having a corresponding interest or duty on a privileged occasion and in a manner and under circumstances fairly warranted by the occasion and duty, right or interest. *The essential elements thereof are good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only.*" *Id.,* citing 50 American Jurisprudence 2d 698, Libel and Slander, Section 195 (emphasis in original).

*Gruenspan v. Seitz*, 124 Ohio App. 3d 197, 204, 705 N.E.2d 1255, (8th Dist. 1997).

Dickerson argues that the alleged statements were made to her friends immediately prior to her traveling to Genesis Hospital to have a rape kit taken and receive the "morning after" pill. (Doc. 1, Compl. ¶ 221). She asserts that other courts have found such statements to be conditionally privileged. She references *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 758 (D. Md. 2015), wherein the court stated in dicta that the statements were likely qualified or conditionally privileged based on the reasoning that they were "probably made in furtherance of her legitimate interest in personal safety and the safety of those closest to her." *Id.* at 758-59. Plaintiff counters that Dickerson's statements were made to friends and acquaintances well before any official statement was made to the university or medical personnel. Plaintiff further argues that Miss Dickerson made the alleged defamatory statements with actual malice, not in good faith, which defeats her privilege argument. (Doc. 36, Pl.'s Resp. at 8). Plaintiff additionally asserts that it is premature to grant Dickerson's motion to dismiss on this claim when no meaningful discovery has been conducted to attempt to resolve some outstanding factual issues and the relevant sequence of events. (*Id.*).

Plaintiff has alleged in his Complaint that "Ms. Zambori and Ms. Dickerson made their Non-Privileged Defamation with actual malice and reckless disregard of their falsity, or with knowledge of their falsity." (Doc. 1, Compl. ¶ 224). Therefore, construing the facts of this case in the light most favorable to Plaintiff, dismissal of Plaintiff's defamation claims on privilege grounds is inappropriate at this stage in the proceedings.

### 2. Intentional Infliction of Emotional Distress

To state a cause of action for intentional infliction of emotional distress, a plaintiff must demonstrate that the defendant by extreme and outrageous conduct intentionally or recklessly

caused severe emotional distress. *Yeager v. Local Union 20, Teamsters*, 6 Ohio St. 3d 369, 374, 453 N.E.2d 666 (1983) (abrogated on other grounds by *Welling v. Weinfeld*, 113 Ohio St. 3d 464, 2007-Ohio-2451, 866 N.E.2d 1051 (2007)). Plaintiff alleges:

> [u]pon information and belief, Ms. Dickerson falsely told Muskingum that Mr. Schaumleffel engaged in non-consensual sexual contact after having reported such information to her friends and to the Emergency Room staff at Genesis Hospital in order to obtain the "morning after" pill. Ms. Dickerson wanted to obtain the morning after pill because Mr. Schaumleffel's condom had come off during sexual intercourse, not because she had been the victim of sexual assault.

(Doc. 1, Compl. ¶ 16).

Because Count 13 seeks to recover for emotional distress caused by Dickerson's alleged defamatory statements, this claim is "properly characterized as a 'disguised defamation' claim[,]" and is subject to the same statute of limitations and immunity arguments as the defamation claim. *See Breno v. City of Mentor*, 8th Dist. Cuyahoga No. 81661, 2003-Ohio-4051, ¶ 12, *abrogated on other grounds by Foley v. Univ. of Dayton*, 150 Ohio St. 3d 252, 2016-Ohio 7591, 81 N.E.3d 398 (Ohio 2016). Defendant Dickerson therefore moves to dismiss both claims on the same grounds as set forth with respect to the defamation claim. For the same reasons as set forth with respect to Plaintiff's defamation claim, dismissal of Plaintiff's intentional infliction of emotional distress claim on privilege grounds is inappropriate at this stage in the proceedings.

### 3.     Motion to Strike

Miss Dickerson requests that this Court strike specific paragraphs of Plaintiff's Complaint "which recount Plaintiff's version of his sexual encounter with Ms. Dickerson and any other paragraphs the Court sua sponte deems scandalous or unnecessary to the pleadings." (Doc. 33, Def. Dickerson's Mot. at 10–11).

Rule 12(f) of the Federal Rules of Civil Procedure permits the court to strike "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). Motions to strike are entrusted to the "sound discretion of the trial court, but are generally disfavored." *Doe v. Bd. of Educ.*, No. 1:16-cv-524, 2017 U.S. Dist. LEXIS 133199 (S.D. Ohio 2017) (Marbley, J.) (quoting *Yates-Mattingly v. Univ. of Cincinnati*, No. 1:11-cv-753, 2013 U.S. Dist. LEXIS 18222, at *1 (S.D. Ohio Feb. 11, 2013) (Black, J.). Indeed, "[s]triking pleadings is considered a drastic remedy to be used sparingly and only when the purposes of justice so require." *Id*. at *6. The Court should grant a motion to strike "only when the pleading stricken has no possible relation to the controversy." *Id*.

Here, many of the allegations set forth in the challenged paragraphs of the Complaint, including the detailed text messages between the couple, support Plaintiff's assertions that Miss Dickerson consented to sexual intercourse. At this stage in the proceedings, the Court cannot find that the challenged allegations "have no possible relation to the controversy," and therefore Defendant Dickerson's Motion to Strike is denied.

## C. Defendant Muskingum's Motion to Dismiss

### 1. Breach of Contract

In Count Three of Plaintiff's Complaint, he alleges breach of contract against Defendant Muskingum. Plaintiff alleges that he enrolled in college at Muskingum and paid tuition and was expected to, and did, abide by Muskingum's Policies. He asserts that Muskingum's Policies created an express contract, or, alternatively, a contract implied in law or in fact between himself and Muskingum. (Doc. 1, Compl. ¶ 240–41). He further alleges that "Muskingum repeatedly and materially breached Muskingum Policies and Mr. Schaumleffel's rights under Title IX incorporated into Muskingum's Policies." (*Id*. at ¶ 242). Defendant Muskingum moves to

dismiss this claim arguing that Plaintiff has failed to allege any specific contract term that was breached or any damages that have occurred as a result of the alleged breach.

When a student enrolls in a college or university, pays his or her tuition and fees, and attends such school, the resulting relationship may reasonably be construed as being contractual in nature. *Prince v. Kent State Univ.*, 10th Dist. Franklin No. 11AP-493, 2012-Ohio-1016, ¶ 30; *Behrend v. State*, 55 Ohio App.2d 135, 379 N.E.2d 617 (10th Dist. 1977), paragraph two of the syllabus. The terms of such a contract are found in the college or university catalog, handbook, and/or other guidelines supplied to the students. *Prince*, citing *Tate v. Owens State Community College*, 10th Dist. Franklin No. 10AP-1201, 2011-Ohio-3452, ¶ 21; *Lewis v. Cleveland State Univ.*, 10th Dist. Franklin No. 10AP-606, 2011-Ohio-1192, ¶ 14.

To establish a claim of breach of contract under Ohio law, a plaintiff must demonstrate: (1) the existence of an enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damages suffered by the plaintiff as a result of the breach. *Jarupan v. Hanna*, 173 Ohio App. 3d 284, 2007-Ohio-5081, 878 N.E.2d 66, ¶ 18 (10th Dist.). "A party breaches a contract if he fails to perform according to the terms of the contract or acts in a manner that is contrary to its provisions." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008).

Plaintiff generally asserts that Muskingum breached the contractual agreement in how it handled Plaintiff's disciplinary process and hearing, such as failing to conduct an impartial investigation and he specifically references that Muskingum did not have students on Plaintiff's hearing panel in breach of the Student Handbook policy. (Doc. 21, Pl.'s Resp. at 10–11; Doc. 1, Compl. ¶¶ 152–153).

Plaintiff alleges that Muskingum failed to conduct an impartial investigation and also challenges the decision to ban him from campus despite any indication that he was a danger. The Student Handbooks outlines the rights of all students and specifically states:

> e. To a process of fundamental fairness as outlined by University policies and procedures, including reasonable notice of a hearing and a written statement of the policies and procedures at issue sent via campus email; a presumption of not being responsible for a violation unless or until an admission of responsibility is entered or responsibility is determined by a preponderance of the evidence (more likely than not) finding "beyond a reasonable doubt" standard is not applicable); and any sanction will be proportionate to the severity of the violation. The University may take interim sanction measures until completion of a hearing process if there appears to be a danger of the student causing harm to him/herself or others, or if the person poses a threat to the well-being of the University's community;

(Doc. 1–17, Handbook at 50–51). The Student Handbook does not contain specific requirements regarding the investigation following a complaint against a student. Muskingum conducted an investigation into the allegations and prepared a report. Those actions are sufficient under the Student Handbook. Further, regarding Plaintiff's challenge to being banned from campus, again there is no requirement of a finding that a student is a danger. Presumably, the University may take interim action based on mere allegations of the assaults as occurred in this case. Further, it is well established that school-disciplinary committees are entitled to a presumption of impartiality, absent an allegation of actual bias. *Pierre v. Univ. of Dayton*, 2017 WL 1134510, at * 7 (S.D. Ohio 2017), citing *Doe v. Cummins*, 662 Fed. Appx. 437, 449-50 (6th Cir. 2016) (citing *Atria v. Vanderbilt Univ.*, 142 Fed. Appx. 246, 256 (6th Cir. 2005) ("[I]n a 'university setting, a disciplinary committee is entitled to a presumption of honesty and integrity, absent a showing of actual bias.'" (quoting *McMillan v. Hunt*, 1992 WL 168827, at *2 (6th Cir. 1992)))).

Plaintiff's final basis for his breach of contract claim is that Muskingum did not have students on the Community Standards Board for his hearing as required by the Student

Handbook.  For Plaintiff's hearing, the Community Standards Board was comprised of: Muskingum administrator Stacey Allan (Chair), and Muskingum faculty members Kenneth Blood, Hallie Baker, and Peter Gosnell.  According to Muskingum's Student Handbook, for all cases resolved through the Community Standards Board process, the Community Standards Board shall be composed as follows:  "The [Community Standards] board is composed of students, staff and faculty members.  Their responsibilities include determining whether an alleged is responsible or not responsible for violations of the Code of Student Conduct and recommending sanctions to the board chair…."  (Doc. 1-17, Student Handbook at 50).  The Student Handbook further specifies the following quorum requirement for proceedings of the Community Standards Board:  "Five members, with at least three students and two faculty/staff members will constitute a quorum."  (*Id*.).  Plaintiff has sufficiently alleged a provision of the Student Handbook that Muskingum has not complied with.  Accordingly, only this breach of contact claim shall remain pending.  All the other allegations of breach of contract are hereby dismissed.

### 2.     Title IX Claims

Counts Four through Seven of Plaintiff's Complaint set forth the following Title IX causes of action: (1) Count 4:  Violation of Title IX – Hostile Work Environment Sexual Harassment and/or Discrimination; (2) Count 5:  Violation of Title IX – Deliberate Indifference; (3) Count 6:  Violation of Title IX – Erroneous Outcome; (4) Count 7:  Violation of Title IX – Selective Enforcement.  Defendant Muskingum asserts that all of the aforementioned claims must be dismissed because the Sixth Circuit has not recognized the Title IX claims alleged. The Court will consider each of the claims in turn.

Title IX of the Education Amendments of 1972 is a federal statute designed to prevent sexual discrimination and harassment in educational institutions receiving federal funding. Title IX specifically provides: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994). Because Muskingum is an institution voluntarily participating in federal spending programs, Muskingum has waived its Eleventh Amendment immunity for Title IX purposes pursuant to 42 U.S.C. § 2000d-7.

Title IX was enacted to supplement the Civil Rights Act of 1964's ban on racial discrimination in the workplace and in universities. Because the statutes share the same substantive goals and because Title IX mirrors the same substantive provisions of Title VII of the Civil Rights Act of 1964, courts interpret Title IX by looking to case law interpreting Title VII employment discrimination cases. *Grove City Coll. v. Bell*, 465 U.S. 555, 566 (1984); *see also Horner v. Ky. Athletic Ass'n*, 206 F.3d 685, 689–92 (6th Cir. 2000) (discussing how the United States Supreme Court has used Title VII analytical framework in cases to interpret Title IX).

When determining whether a plaintiff was able to demonstrate that intentional gender discrimination occurred in a university disciplinary proceeding, the Sixth Circuit utilizes the analytical framework provided in *Yusuf*. *See Doe v. Cummins*, 662 F. App'x 437, 451–52 (6th Cir. 2016); *Mallory v. Ohio Univ.*, 76 F. App'x 634, 638 (6th Cir. 2003). In *Yusuf*, the Second Circuit Court of Appeals found that Title IX claims arising from disciplinary hearings can generally be challenged under two categories: erroneous outcome and selective enforcement.

*Yusuf*, 35 F.3d at 714–15.  Under either standard, a plaintiff must show that gender bias was the source of the deprivation.  *Id*. at 715; *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015) (noting Title IX's prohibition against discrimination "on the basis of sex") (Dlott, J.).  The plaintiff in *Mallory* also asked the Sixth Circuit to adopt two additional standards for analyzing whether disciplinary proceedings violate Title IX's prescription against intentional discrimination: deliberate indifference and archaic assumptions.  *Mallory*, 76 F. App'x at 638–39.  Although the *Mallory* court did not specifically determine whether it would adopt the deliberate indifference and archaic assumptions standards, the court provided no analysis of Plaintiff's claims under either standard.  *Id.*  In a recent decision by the Sixth Circuit, the Court noted

> We have recognized, although never explicitly adopted in a published opinion, at
> least four theories of liability that a student who is 'attacking a university
> disciplinary proceeding on grounds of gender bias" . . . can potentially assert
> under Title IX.  These theories include: (1) 'erroneous outcome,' (2) 'selective
> enforcement,' (3) 'deliberate indifference,' and (4) 'archaic assumptions.'

*Doe v. Miami Univ., et al.*, No. 17-3396, 2018 U.S. App. LEXIS 3075, *15 (6th Cir. 2018).

### a.    Hostile Environment Sexual Harassment and/or Discrimination

In Count 4 of his Complaint, Plaintiff alleges a violation of Title IX under a hostile-environment theory, asserting that "Muskingum created an environment in which male students accused of sexual assault . . . are fundamentally denied their rights under Title IX and/or Muskingum Policies so as to be virtually assured of a finding of Responsible.  Such a biased and one-sided process deprives male Muskingum students like Mr. Schaumleffel of educational opportunities based on their gender."  (Doc. 1, Compl. ¶ 254).  Additionally, he states that "Muskingum's investigation and/or discipline of Doe [sic] is discriminatory and based upon or motivated by Mr. Schaumleffel's male gender."  (*Id*. at ¶ 258).  Further, Plaintiff alleges in this

claim that Muskingum acted with deliberate indifference and made an erroneous determination that Plaintiff violated Muskingum policies, in violation of Title IX which will be addressed in turn. (*Id*. at ¶¶ 260–262).

A Title IX hostile-environment claim is analogous to a Title VII hostile work environment claim. *Doe v. Clairborne Cty.*, 103 F.3d 495, 515 (6th Cir. 1996). Therefore, in order for Plaintiff to maintain a hostile-environment/discrimination claim under Title IX, he must sufficiently plead that: (1) he is a member of a protected class; (2) he was subjected to adverse action; (3) he was qualified for the opportunity that was denied; and (4) that a comparable non-protected person received better treatment. *Id*. With respect to the last requirement, to demonstrate that he was treated differently than a similarly situated person of the opposite gender, Plaintiff must demonstrate that "all relevant aspects" of his situation are "nearly identical" to those of the allegedly similarly situated person. *Humenny v. Genex Corp*., 390 F. 3d 901, 906 (6th Cir. 2004). Further, he must allege that "his educational experience was 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive [so as] to alter the conditions of the victim's' educational environment." *Miami Univ., et al.*, 2018 U.S. App. LEXIS 3075, *16 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

In the case at bar, Defendant Muskingum argues that Plaintiff has failed to plead that Muskingum has a pattern and practice of gender bias against males. Muskingum asserts that the so called examples set forth in Plaintiff's Complaint are "baseless conclusions with no evidence, even circumstantial, to rely upon." (Doc. 34, Def. Muskingum's Reply at 4). Muskingum asks this Court to apply the same reasoning set forth in *Doe v. Denison Univ., et al*., No. 16-cv-143, 2017 U.S. Dist. LEXIS 53168, *33 (S.D. Ohio 2017) (Watson, J.), concluding that "without any

plausible factual allegations about other cases in which Denison University disciplined male students for sexual assault, let alone disciplined them in a gender-biased manner, Plaintiff's Amended Complaint comes far short of containing any plausible factual allegations to support his conclusory allegations that Denison University engaged in a pattern and practice of gender-biased decision making." *Id*.

Plaintiff responds again with the same allegations from his Complaint, that anti-male gender-bias motivated his unlawful discipline and that indirect/circumstantial evidence is sufficient to maintain a claim. He asserts that "Muskingum's employees are smart enough to not explicitly telegraph the intent to discriminate. Instead, people often hid discriminatory intent behind the pretext of facially neutral statements." (Doc. 21, Pl.'s Resp. at 13). Plaintiff has sufficiently pled that he suffered an adverse action and that he was otherwise qualified to be a student at Muskingum. However, in this case, similar to the *Denison* case, Plaintiff has failed to provide plausible factual allegations about other male students disciplined for sexual assault in a gender-biased manner, or even other male students disciplined for sexual assault. Nor has Plaintiff identified any female student who was accused of violating Muskingum's sexual misconduct policies and not appropriately disciplined. Further, he has not alleged facts that "support a reasonable inference that his educational experience was 'permeated with discriminatory intimidation, ridicule, and insult.'" *Miami Univ.*, 2018 U.S. App. LEXIS at *16 (quoting *Harris*, 510 U.S. at 21). Accordingly, Plaintiff has not sufficiently pled a claim for Title IX hostile environment/sexual harassment.

Further, as noted above, based on *Mallory* and *Cummins*, the Sixth Circuit appears to have recognized the "erroneous outcome" and "selective enforcement" categories of Title IX claims in the disciplinary context, but not a separate "hostile environment" theory of Title IX

liability in the disciplinary proceeding context absent allegations of sexual harassment.

Therefore, to the extent Plaintiff is also alleging a hostile environment sexual harassment claim, his allegations are insufficient to maintain such a claim. *See Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 758 (D. Md. 2015) (finding that allegations that the university investigated and disciplined the plaintiff's alleged sexual assault without proper jurisdiction, the university's employees lacked proper training to investigate and/or discipline pursuant to Title IX, the university's policies were biased against men in violation of Title IX and due process were insufficient to state a claim for "harassment" for purposes of bringing a hostile environment sexual harassment claim).

### b.      Deliberate Indifference

In Count 5, Plaintiff alleges another Title IX claim for deliberate indifference. Specifically, he asserts that "Muskingum's employees exhibited deliberate indifference by refusing to remedy:  (a) Muskingum's violations of Mr. Schaumleffel's rights under Muskingum Policies, Title IX, and/or guidance promulgated by OCR, and/or (b) Muskingum's erroneous determination that Mr. Schaumleffel violated Muskingum Policies which Muskingum adopted pursuant to federal laws and regulations related to Title IX."  (Doc. 1, Compl. ¶ 269).

The deliberate indifference standard applies when a plaintiff seeks to hold a university responsible for sexual harassment.  *See Mallory*, 2003 76 F. App'x at 638–39 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998)).  To maintain a claim for deliberate indifference under Title IX, Plaintiff must "demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct."  *Id*. at 638.  Further, "a deliberate-indifference claim premised on student-on-student misconduct must allege 'harassment that is so severe, pervasive, and objectively

28

offensive that it effectively bars the victim's access to an educational opportunity or benefit.'"
*Miami Univ.*, 2018 U.S. App. LEXIS at *17–18 (quoting Davis v. Monroe Cty. Bd. of Educ., 526
U.S. 629, 633 (1999)).

The Sixth Circuit acknowledged that in *Mallory*, they "did not explicitly state whether a
deliberate-indifference claim in this context requires the plaintiff to plead that the misconduct
alleged is sexual harassment, because [they] only assumed arguendo that this theory applied."
*Id.* (quoting *Mallory*, 76 F. App'x at 638–39).[6]  Therefore, in *Doe v. Miami*, the Sixth Circuit
clarified that "to plead sufficiently a Title IX deliberate-indifference claim the misconduct
alleged must be sexual harassment." *Id.* at 19.

In this case, Plaintiff's specific allegations include that Muskingum acted with deliberate
indifference in implementing their "authority to institute corrective" action (by persuading him
not to appeal the findings of responsibility and by refusing the reverse his expulsion when he
requested reconsideration on the basis of his polygraph examination).  (Doc. 1, Compl. ¶¶ 13,
187–88).  Essentially, his deliberate indifference claims are based on the alleged gender
discrimination that occurred throughout his disciplinary process.  And like the Sixth Circuit held
in *Miami Univ.*, this claim must fail "because the alleged gender discrimination is not tethered to
a claim of sexual harassment." *Miami Univ.*, 2018 U.S. App. LEXIS at *19.

---

[6]  Courts in the Sixth Circuit were not clear as to what constitutes a properly pled deliberate indifference
claim under Title IX.  *See Sahm*, 110 F. Supp. 3d at 778, n.1 ("At least one district court in the Sixth
Circuit has held that [] sexual harassment is a 'critical component' of a Title IX deliberate indifference
claim.  *See Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 757–58 (E.D. Tenn. 2009).  A sister court in
the Southern District of Ohio . . . did not limit the deliberate indifference theory to only sexual harassment
cases." (citing *Wells v. Xavier Univ.*, 7 F. Supp. 3d. 746, 751–52, n.2 (S.D. Ohio 2014) (Spiegel, J.))).

### c.    Erroneous Outcome

Plaintiff's third Title IX claim for erroneous outcome alleges that "Muskingum's employees unlawfully failed to exercise the authority to institute corrective measures to remedy: (a) Muskingum's violations of Mr. Schaumleffel's rights under Muskingum Policies, Title IX, and/or guidance promulgated by OCR, and/or (b) Muskingum's erroneous determination that Mr. Schaumleffel violated Muskingum Policies which Muskingum adopted pursuant to federal laws and regulations related to Title IX."  (Doc. 1, Compl. ¶ 275).  Defendant Muskingum argues that Plaintiff cannot maintain this claim because he has failed to show a causal connection between the alleged erroneous outcome and the gender bias.  (Docs. 5 and 34).

An erroneous outcome claim exists when an "innocent" person was wrongly found to have committed an offense because of his or her gender.  *Sahm*, 110 F. Supp. 3d at 777–78 (citing *Yusaf*, 35 F.3d at 715).  In order to state a claim for "erroneous outcome" under Title IX, a plaintiff must plead two elements: (1) facts sufficient to cast doubts about the accuracy of the outcome of the disciplinary hearing; and (2) a causal connection between the flawed outcome and gender bias.  *Id*.  Therefore, Plaintiff must demonstrate that Defendants' actions were "motivated by sexual bias" and that Muskingum's "disciplinary hearing process constitutes a 'pattern of decision-making' whereby the . . . disciplinary procedures governing sexual assault claims [are] 'discriminatorily applied or motivated by a chauvinistic view of the sexes.'"  *Case W. Reserve*, 2015 WL 5522001, *5 (quoting *Univ. of the S.*, 687 F. Supp. at 756).  In order to properly state a claim alleging that Defendants' actions were motivated by sexual bias, Plaintiff cannot rely on mere conclusory allegations or claims with no factual support.  Instead, such allegations must include, ". . . *inter alia*, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show

the influence of gender." *Id*. at *6 (quoting *Yusuf*, 35 F. 3d at 715).  "However, a single case by an individual who was displeased by the result of a disciplinary proceeding cannot constitute a pattern of decision-making." *Id*.

In this case, Defendants concede that "[a]dopting the allegations of the complaint as true, one might conclude that Muskingum failed to follow its rules in some fashion, and thus, the Plaintiff arguably may have satisfied the first of the "erroneous outcome" requirements."  (Doc. 5, Def. Muskingum's Mot. at 8).  The Court agrees.  Plaintiff has alleged facts that cast doubt on the accuracy and ultimate outcome of the disciplinary proceeding against him.  He has submitted significant evidence to establish that he and Miss Dickerson and Miss Zambori hung out/dated. Further, the timing of the complaints against him, suggest involvement by Muskingum in persuading the girls to file complaints.

However, the second element of the erroneous outcome claim remains, i.e. has Plaintiff sufficiently pled a causal connection between the flawed outcome and gender bias?  Plaintiff has made some general allegations of gender bias and cited numerous cases from across the country that faced similar issues and allowing the plaintiffs' erroneous outcome claims to survive at the motion to dismiss stage.[7]  (*See* Doc. 21, Pl.'s Resp. at 29–34).  There is little doubt that universities around the country have felt pressure to tighten the investigation and punishments in sexual misconduct cases because this is a very sensitive issue.  However, there are genuine concerns raised in these cases regarding how universities are handling the investigations.  In *Doe*

_____

[7] Plaintiff references six cases in support of his erroneous outcome claim in which courts have rejected motions to dismiss the plaintiffs' Title IX claims:  (Doc. 40, Pl.'s Resp. at 36–37) (citing *Wells v. Xavier Univ*., 7 F. Supp. 3d 746 (S.D. Ohio 2014); *Doe v. Brown Univ*., 166 F. Supp. 3d 177 (D.R.I. 2016); *Marshall v. Ind. Univ*., 170 F. Supp. 3d 1201 (S.D. Ind. 2016); *Doe v. Washington and Lee*, No. 6:14-CV-52, 2015 U.S. Dist. LEXIS 102426 (W.D. Va. Aug. 5, 2015); *Doe v. Salisbury Univ*., 123 F. Supp. 3d 748 (D. Md. 2015); and *Doe v. Bd. of Regents of the Univ. Sys. of Ga*., 215 Ga. App. 684 (Ga. Ct. App. 1994)).

*v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572–73 (D. Mass. 2016), the court recognized that universities across the country have adopted "procedural and substantive policies intended to make it easier for victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response." The *Brandeis* court noted that Harvard University adopted a sexual harassment policy similar to the policy at issue in *Brandeis*. *Id.* at 573. In response to the Harvard policy:

> 28 members of the Harvard Law School faculty issued a statement voicing their "strong objections" to the policy. *Id.* Among other things, the statement concluded that 'Harvard has adopted procedures for deciding cases of alleged sexual misconduct which lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation.' *Id.* It called upon Harvard to 'begin the challenging project of carefully thinking through what substantive and procedural rules would best balance the complex issues involved in addressing sexual conduct and misconduct in our community.' *Id.*

> The goal must not be simply to go as far as possible in the direction of preventing anything that some might characterize as sexual harassment. The goal must instead be to fully address sexual harassment while at the same time protecting students against unfair and inappropriate discipline, honoring individual relationship autonomy, and maintaining the values of academic freedom.

> Like Harvard, Brandeis appears to have substantially impaired, if not eliminated, an accused student's right to a fair and impartial process. And it is not enough simply to say that such changes are appropriate because victims of sexual assault have not always achieved justice in the past. Whether someone is a 'victim' is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning. Each case must be decided on its own merits, according to its own facts. If a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to defend himself and an impartial arbiter to make that decision.

> Put simply, a fair determination of the facts requires a fair process, not tilted to favor a particular outcome, and a fair and neutral fact-finder, not predisposed to reach a particular conclusion.

*Brandeis*, 177 F. Supp. 3d at 573. The *Brandeis* court succinctly concluded that "[t]he goal must instead be to fully address sexual harassment while at the same time protecting students against

unfair and inappropriate discipline . . .".  177 F. Supp. 3d at 573.  However, despite Plaintiff's

repeated arguments that Miss Dickerson and Miss Zambori's allegations were false and that they

consented, it is not the role of this Court to make a determination as to the underlying claims.

*Wood v. Strickland*, 420 U.S. 308, 326 (1975) ("It is not the role of the federal courts to set aside

decisions of school administrators which the court may view as lacking in wisdom or

compassion.")

 To establish a causal connection between the flawed outcome and gender bias, such

allegations might include:  "statements by members of the disciplinary tribunal, statements by

pertinent university officials, or patterns of decision-making that also tend to show the influence

of gender." *Yusuf*, 35 F.3d at 715.  Plaintiff argues that he has satisfied all of the above, citing

numerous examples from the way Muskingum defines victim as a woman, to Allan and Zifzal's

biased training materials, to Muskingum's fear of federal funding being cut if no action was

taken.  However, Plaintiff is lacking any specific statements of gender bias with respect to his

disciplinary proceedings.  Nonetheless, based on all of the above referenced allegations, at this

stage in the proceedings, Plaintiff has made sufficient general allegations of gender bias to

suggest there was discrimination in the investigation and hearing process.  *See Collick v. William

Paterson Univ.*, No. 16-471, 2016 U.S. Dist. LEXIS 160359, at *35 (D. N.J. 2016) ("Whether

such allegations are true (or can survive summary judgment) remains an open question.  At the

pleading stage, however, an allegation that the process was one-sided, irregular, and unsupported

by evidence may give rise to an inference of bias).[8]  The Sixth Circuit also held in a similar

---

[8]  The Court acknowledges that as recognized in *Doe v. Columbus Univ.*, 831 F.3d 46, 57 (2nd Cir. 2016),
"[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms
a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to
infer (although by no means necessarily correct) that the evaluator has been influenced by bias."
However, it may not "necessarily relate to bias on account of sex." *Id*.  Therefore, although difficult to

situation that "the statistical evidence that ostensibly shows a pattern of gender-based decision-making and the external pressure on Miami University supports at the motion-to-dismiss stage a reasonable inference of gender discrimination." *Miami Univ.*, 2018 U.S. App. LEXIS at *25. Further, "[c]onsidering all of these factual allegations relating to Miami University's pattern of activity respecting sexual-assault matters and the asserted pressures placed on the University, John has pleaded sufficient specific facts to support a reasonable inference of gender discrimination. At the pleading stage, John's allegations need only create the plausible inference of intentional gender discrimination." *Id*. Accordingly, at this stage in the proceedings, Plaintiff has sufficiently pled a claim of erroneous outcome under Title IX.

### d. Selective Enforcement

Plaintiff alleges in Count 7, his final Title IX claim that Muskingum engaged in the selective enforcement of their policies on the basis of gender. (Doc. 1, Compl. ¶ 282). Plaintiff further asserts that Muskingum does not discipline female students accused of sexually assaulting males and that Muskingum possesses the necessary information to establish this claim. (Doc. 1, Compl. ¶ 263).

"To prevail on a 'selective enforcement' claim, the plaintiff must show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender." *Cummins*, 662 F. App'x at 452 (citations omitted). To state a selective

---

distinguish at this stage, it is possible that Muskingum was biased in favor of the alleged victims of sexual assault cases and against the alleged perpetrators, but courts have held that this is not the same as demonstrating bias against male students. *See Bleiler v. Coll. of Holy Cross*, No. 11-11541, 2013 U.S. Dist. LEXIS 127775 (D. Mass. Aug. 26, 2013); *see also King v. DePauw Univ.*, No. 2:14-cv-70, 2014 U.S. Dist. LEXIS 117075, at *10 (S.D. Ind. Aug. 22, 2014) (demonstrating a bias against students accused of sexual assault is not the equivalent of demonstrating a bias against males, even if all of the students accused of assault were male); *Haley v. Va. Commonwealth Univ.*, 948 F. Supp. 573, 579 (E.D. Va. 1996) (stating that "a bias against people accused of sexual harassment and in favor of victims . . . indicate[s] nothing about gender discrimination").

enforcement claim, a plaintiff must "identif[y] . . . a comparator of the opposite sex who was treated more favorably by the educational institution *when facing similar disciplinary charges.*" *Id.* (citing *Yusuf*, 35 F.3d at 716) (emphasis added). Plaintiff, here, has failed to assert any allegations that a female student was not disciplined by Muskingum after a complaint was filed similar to the allegations made against Plaintiff in this case. Therefore, Plaintiff's conclusory allegations are insufficient to maintain a claim for selective enforcement under Title IX.

### 3. Declaratory Judgment

In Count 8, Plaintiff has requested a declaratory judgment for violation of his rights under Muskingum's Policies, Title IX and/or OCR regulations. (Doc. 1, Compl. ¶ 289).

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. The Supreme Court has indicated that this act "confer[s] on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co*., 515 U.S. 277, 286 (1995). In passing the act, Congress "created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants." *Id*. at 288. District courts are afforded substantial discretion to exercise jurisdiction "in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and fitness of the case for resolution, are peculiarly within their grasp." *Id*. at 289.

Because this Court has found that Plaintiff has sufficiently stated a claim for violation of his rights under Muskingum's Policies and Title IX erroneous outcome, he has sufficiently pled a

claim that may justify the issuance of a declaratory judgment at a later stage of the proceedings. Therefore, at this time, Defendant's Motion to Dismiss is denied with respect to this claim.

### 4. Promissory Estoppel

In Count 9, Plaintiff asserts a claim for promissory estoppel against Muskingum, as "an alternative to Mr. Schaumleffel's Breach of Contract, Negligence, Fraud and/or Negligent Misrepresentation Claims." (Doc. 1, Compl. at 84). In order to establish a claim for promissory estoppel under Ohio law, a plaintiff must establish the following elements: (1) a clear and unambiguous promise; (2) reliance upon the promise by the person to whom the promise is made; (3) the reliance is reasonable and forseeable; and (4) the person claiming reliance was injured as a result of the reliance on the promise. *Doe v. Case Western Reserve Univ*., No. 1:17-cv-414, 2017 U.S. Dist. LEXIS 142002, *37 (N.D. Ohio 2017); *Stewart v. Everyware Global, Inc*., 68 F.Supp.3d 759, 766 (S.D. Ohio 2014) (Graham, J.).

Defendant Muskingum argues that Plaintiff's promissory estoppel claim must be dismissed because there is a valid contract between Muskingum and Plaintiff based upon Muskingum's policies set forth in the Student Handbook and Code of Student Conduct. Defendant, relying on *DuBrul v. Citrosuco North America, Inc.*, 892 F.Supp.2d 892, 914 (S.D. Ohio 2012), asserts that a claim for promissory estoppel is "not available. . . where the legal relationship between the parties is governed by a valid and enforceable contract." Defendant further argues that Plaintiff has not identified any clear, unambiguous promise in the Complaint.

Muskingum is correct that the existence of a valid and enforceable contract "generally" precludes a claim of promissory estoppel arising from claims related to the contract. *O'Neill v. Kemper Ins. Cos.*, 497 F.3d 578, 583 (6th Cir. 2007). However, Ohio courts do permit promissory estoppel claims to be pleaded alternatively to breach of contract claims, although

damages cannot be awarded for the same wrong under both claims. *Bonner Farms, Ltd. v. Power Gas Mktg. & Transmission*, No. 5:04-2188, 2017 U. S. Dist. LEXIS 63359, *7 (N.D. Ohio 2007) (Promissory estoppel and unjust enrichment are quasi-contractual or equitable claims that may be pled in the alternative to a breach of contract claim).

Plaintiff asserts that he "detrimentally relied on Muskingum's promises to adjudicate Ms. Zambori's and Ms. Dickerson's false allegations of sexual misconduct in accordance with Muskingum Policies and applicable law." (Doc. 1, Compl. ¶ 291). Further, Plaintiff has alleged that he has sustained emotional distress and damages to his academic and professional reputation as a result. Accordingly, Plaintiff has sufficiently pleaded a claim for promissory estoppel in the alternative.

### 5.  Negligence

In Count 10, Plaintiff asserts, in the alternative, a claim for negligence against Muskingum. Plaintiff alleges that Muskingum owed him a duty to honor the provisions of Muskingum's Policies and breached that duty by conducting the disciplinary proceedings that violated his rights and Muskingum's Policies. (Doc. 1, Compl. ¶ 294). Plaintiff further asserts that he suffered damages as a result of the aforementioned breach. The elements of a negligence claim are "(1) the existence of a legal duty, (2) the defendant's breach of that duty, and (3) injury that is the proximate cause of the defendant's breach." *Schmitz v. Natl. Collegiate Athletic Assn.*, 2016-Ohio-8041, 67 N.E.3d 852, ¶ 46 (8th Dist.) (citing *Wallace v. Ohio DOC*, 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018, ¶ 22).

Defendant Muskingum argues that Plaintiff's negligence claim must fail because it complied with all its duties in conducting Plaintiff's disciplinary proceedings. Further, Defendant argues that to the extent the claim arises under Title IX, "Title IX does not create

negligence liability on the part of educational institutions." *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 657 (5th Cir. 1997). Plaintiff concedes that his negligence claim is not based on Title IX.

Here, Plaintiff's negligence claim is essentially a restatement or alternative to his breach of contract claim. Plaintiff asserts that Muskingum owed him a duty arising out of the duties set forth in Muskingum's Student Handbook and Code of Conduct. Generally, the existence of a contract action precludes the opportunity to present the same case as a tort claim. A tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breached a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed. *See Wright v. Bank of Am. N.A.*, 517 Fed. Appx. 304, 307 (6th Cir. 2013). Thus, Plaintiff's negligence claim based upon a duty arising from Muskingum's Policies is barred because the alleged duties are contractual duties, not separate and independent duties created by common law that would exist even if no contract existed.

However, Plaintiff's negligence claim based upon a duty allegedly owed by Muskingum arising under FERPA for disclosing information about the charges against Plaintiff and his expulsion to Defendant Neal are not necessarily duplicative of Plaintiff's breach of contract claim and therefore, at this stage in the proceedings, may proceed.

**6. Fraud**

Count 11 of Plaintiff's Complaint raises a claim of fraud, again as an alternative theory to his breach of contract, promissory estoppel and/or negligence claims. He alleges that Muskingum made both express and implied promises to him regarding his right to appeal the decision of the Community Standards Board and specifically that he was misled to appeal only

the severity of the sanction imposed, rather than the finding of responsibility for sexual harassment and non-consensual sexual intercourse. (Doc. 1, Compl. ¶¶ 297–303). Muskingum asserts that Plaintiff's fraud claim must be dismissed because it was not pled with the specificity required by Rule 9 of the Federal Rules of Civil Procedure. Rule 9 states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other conditions of mind of a person may be averred generally." "In complying with Rule 9(b), a plaintiff, at a minimum, must allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007).

Plaintiff asserts that he has plead the requirements of fraud as set forth in paragraphs 186–88 of his Complaint regarding the discussion he had with Farley and Allan regarding his right to appeal and their direction to appeal only the sanction. (Doc. 21, Pl.'s Resp. at 42). Plaintiff has set forth the date and the fact that a discussion took place. However, the Court does not find that the aforementioned allegations are sufficient to maintain a fraud claim. Plaintiff mentions a discussion and the advice given, but this does not amount to a fraudulent scheme, nor are there any allegations regarding Defendant's fraudulent intent. Accordingly, Plaintiff's fraud claim is hereby dismissed.

### 7. Negligent Misrepresentation

In Count 12 of his Complaint, Plaintiff alleges a claim for negligent misrepresentation as an alternative to his breach of contract, promissory estoppel and/or negligent claims. Similar to his above fraud claim, he alleged that Muskingum made express and implied promises to provide him with impartial guidance regarding Muskingum's policies and regarding his right to appeal.

(Doc. 1, Compl. ¶¶ 305–11).  The Ohio Supreme Court has defined negligent misrepresentation as:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Delman v. Cleveland Hts.*, 41 Ohio St.3d 1, 4 (1989).  Defendant argues, and the Court agrees that Plaintiff was not involved in a business transaction where he alleged he received false information.  Nor has he set forth what pecuniary loss was caused by Muskingum.  Accordingly, Plaintiff's claim for negligent misrepresentation must also be dismissed.

### 8.        Intentional and/or Negligent Infliction of Emotional Distress

In Counts 13 and 14, Plaintiff brings claims for both intentional and negligent infliction of emotional distress.  Plaintiff concedes in his response that Count 14 for negligent infliction of emotional distress does not meet the requirements of Ohio law and therefore must be dismissed. (Doc. 21, Pl.'s Resp. at 46).

Defendant Muskingum sets forth a number of reasons in support of the motion to dismiss Plaintiff's emotion distress claims.  The Court finds two specific arguments persuasive.  First, the existence of a valid contract prevents Plaintiff from maintaining a claim for intentional infliction of emotional distress as his claim is based on the alleged violation of Muskingum's contractual obligations.  It is well settled that a plaintiff cannot maintain a cause of action for emotional distress caused by an alleged contract breach.  *See Valente*, 689 F. Supp. 2d at 927 (dismissing a student's intentional infliction of emotional distress claim where it was based on the same alleged conduct as his breach of contract claim).

Next, Plaintiff's emotional distress claim also fails because he has not alleged sufficient facts that Muskingum's conduct was "extreme and outrageous." *Doe v. College of Wooster*, 243 F. Supp.3d 875, 895 (N.D. Ohio 2017). Specifically, the conduct at issue must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citing *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 376 (6th Cir. 1999)). Muskingum, similar to the College of Wooster, investigated and disciplined Plaintiff in this case "in response to a claim of sexual assault lodged by another student." *Id.*; *see also Fellheimer v. Middlebury Coll.*, 869 F. Supp. 238, 247 (D. Vt. 1994) ("A College's decision, when confronted with a female student's accusation of rape, to confront the male student with the charges, hold a hearing, and support the findings of the initial tribunal on appeal, even where various procedural errors are alleged, cannot form the basis for an [intentional infliction of emotional distress] claim."). Therefore, the allegations in this case fail to satisfy the extreme and outrageous pleading requirements and Plaintiff's intentional infliction of emotional distress claim must be dismissed.

### 9. Breach of the Covenant of Good Faith and Fair Dealing

In Count 15, Plaintiff's final claim against Muskingum, he brings a claim for breach of the covenant of good faith and fair dealing. He generally asserts that this covenant was implied in his agreements with Muskingum and that "Muskingum acted in bad faith in causing the erroneous discipline of Mr. Schaumleffel and/or the disproportionate sanction imposed on Mr. Schaumleffel." (Doc. 1, Compl. ¶¶ 330–31). Defendant Muskingum argues that this claim must be dismissed because Ohio does not recognize an independent cause of action for breach of the covenant of good faith and fair dealing. The Court agrees. The Sixth Circuit recently stated that "Ohio law recognizes only a breach of contract claim; it does not recognize a free-standing or

independent claim for breach of the covenants of good faith and fair dealing. *Patrick v. CitiMortgage, Inc.*, 676 Fed. Appx. 573, 577 (6th Cir. 2017); *see also Accord Lakota Local School Dist. v. Brickner*, 108 Ohio App. 3d 637, 646, 671 N.E.2d 578 (6th Dist. 1996) (Dismissed breach of covenant of good faith and fair dealing claim because there is no tort cause of action for breach of good faith and fair dealing that is separate from a breach of contract claim. Rather, "good faith is part of a contract claim and does not stand alone."). Based upon this precedent, Plaintiff's claim for breach of the covenant of good faith and fair dealing is hereby dismissed.

## IV. CONCLUSION

Based on the foregoing reasons, Defendants Zambori and Dickerson's Motions to Dismiss are **GRANTED IN PART AND DENIED IN PART**. Plaintiff's claims for negligent infliction of emotional distress are dismissed. All other claims against both Miss Zambori and Miss Dickerson remain pending. Further, Miss Dickerson's Motion to Strike is **DENIED**. Defendant Muskingum's Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART**. Plaintiff's claims for breach of contract, erroneous outcome in violation of Title IX, promissory estoppel, declaratory judgment, and negligence remain pending. All of Plaintiff's other claims against Muskingum are hereby dismissed.

The Clerk of this Court shall remove Documents 5, 29, and 33 from the Court's pending motions list.

**IT IS SO ORDERED.**

*s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**